UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | CIVIL ACTION |
| VERSUS | * | NUMBER 03-3208 |
| LOUISIANA LAND & EXPLORATION COMPANY | * | SECTION "L"(3) |

### ORDER AND REASONS

Pending before the Court is Louisiana Land and Exploration Co.'s Motion for Summary Judgment (Rec. Doc. 101) and the United States of America's Cross-Motion for Summary Judgment (Rec. Doc. 113). For the following reasons, Louisiana Land and Exploration Co.'s Motion is GRANTED and the United States of America's Cross-Motion is DENIED.

**I.  BACKGROUND**

On April 12, 1966, Louisiana Land and Exploration Co. ("LL&E") acquired ownership of certain tracts of land in the Golden Meadow Field in Lafourche Parish, Louisiana, which are adjacent to Bayou Lafourche. At the time of acquisition, the tracts of land were subject to an existing mineral lease that had been acquired by Charles A. O'Niell, Jr. ("O'Niell, Jr.") on April 12, 1966.

O'Niell, Jr.'s lease provided that after the discovery and production of oil, gas, or any other mineral in paying quantities, the lease shall remain in effect for as long as oil, gas, or some other mineral is being produced in paying quantities or the lessee is carrying on

1



operations with reasonable diligence looking for the production thereof. The lease further provided that if production ceases for any reason, the lease shall terminate unless the lessee resumes or restores the production or initiates other drilling or mining work within ninety days.

At the time of LL&E's acquisition of the land, O'Niell, Jr. was already engaged in exploration and production activities both in his individual capacity and subsequently through a partnership known as O'Niell Oil Company. In 1987, this partnership transferred its assets to O'Niell Oil Company, Inc. ("O'Niell Oil"). In June and July 1997, O'Niell Oil entered into subleases with Dimension Energy Co., L.L.C. ("Dimension").

In 2003, LL&E sold its property. Before the sale, LL&E had a 1/32 overriding royalty and a 1/3 of a 1/8 royalty on production which it acquired with the property purchase. LL&E's total royalty was approximately 4.1% of production.

Throughout the time of O'Niell Jr.'s and O'Niell Oil's (collectively "O'Niell") operations and LL&E's ownership, LL&E observed and sent O'Niell several letters regarding unacceptable environmental conditions on the leased property. O'Niell initially made some efforts to clean up its operations. By the early 1980s, however, the Louisiana Department of Environmental Quality ("DEQ") and Louisiana Department of Natural Resources ("DNR") became involved in the effort to remedy environmental problems on the leased property. Ultimately, the DNR began issuing compliance orders to O'Niell. On October 8, 1999, John O'Connell, an agent of LL&E, sent O'Niell another letter. In this letter, LL&E requested that O'Niell remove certain pieces of abandoned equipment and trash, including wellheads, tanks, pipe, board road, houses, and other debris, from the property.

On August 11, 2000, the United States Coast Guard ("Coast Guard") and the DNR

discovered that a 5,000 barrel tank was leaking oily waste at an oil facility on LL&E's property. The oil facility consisted of five oil wells, the 5,000 barrel tank, eighteen other tanks, and associated piping. The leak was secured and the product was removed from the tank by August 15, 2000. In addition to cleaning out the tank, the Coast Guard conducted an extensive dismantling of the tanks and facility, built a plank road to transport the product and dismantled facility from the field, and performed a plugging and abandonment of three oil wells. The entire remediation project was completed by March 2001 and cost the Coast Guard approximately $792,000.

On November 13, 2003, the United States filed suit against LL&E under the Oil Pollution Act of 1990 ("OPA-90") seeking to recoup the remediation costs expended on the project as well as attorneys fees and legal costs.

## II.     PRESENT MOTIONS

In its motion for summary judgment, LL&E contends that it is not a "responsible party" as defined by OPA-90 and, as such, cannot be found liable. In its cross-motion for summary judgment, the United States contends that LL&E is a responsible party under OPA-90. Furthermore, the United States contends that it is entitled to summary judgment because there is no genuine issue of material fact as to any element necessary to its OPA-90 claim and, as such, it is entitled to judgment as a matter of law.

## III.    LAW AND ANALYSIS

Summary judgment is appropriate if the record, as a whole, shows that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). To overcome summary judgment,

3

"the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." *Matshusita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The Court must view the evidence in the light most favorable to the nonmovant and draw all reasonable inferences in the nonmovant's favor. *Riverwood Int'l Corp. v. Employers Ins. of Wausau*, 420 F.3d 378, 382 (5th Cir. 2005).

Section 2702(a) of title 33 of the United States Code provides:

> Notwithstanding any other provision or rule of law, and subject to the provisions of this Act, each responsible party for a vessel or a facility from which oil is discharged, or which poses the substantial threat of a discharge of oil, into or upon the navigable waters or adjoining shorelines or the exclusive economic zone is liable for the removal costs and damages specified in subsection (b) of this section that result from this incident.

Under section 2702(a), there are five elements necessary for the imposition of liability: (1) a responsible party; (2) a vessel or facility; (3) a discharge of oil or a substantial threat of a discharge of oil; (4) navigable waters; and (5) removal costs and damages.

### A. Responsible Party

Under OPA-90, for purposes of an onshore facility,[1] a "responsible party" is "any person owning or operating the facility . . . ." 33 U.S.C. § 2701(32)(B). Moreover, for purposes of an abandoned onshore facility, a "responsible party" is "the person[] who would have been [the] responsible part[y] immediately prior to the abandonment of the . . . facility." *Id.* § 2701(32)(F). "Owner or operator," as defined under OPA-90, for purposes of a onshore facility, means "any person owning or operating such facility." *Id.* § 2701(26)(A)(ii). All parties are in agreement that LL&E never operated the structures on its land. Thus, for liability

---

[1] All parties are in agreement that the structures at issue are properly classified as an onshore facility.

to attach, LL&E must have owned the leaking structures at the time of the remediation.

The definition of owner under OPA-90 is completely circular—the owner of a facility is the person who owns the facility. Since OPA-90 does not provide guidance as to the definition of owner, this Court will look to Louisiana law to determine the ownership of the leaking structures.

Under Louisiana law, buildings and other constructions permanently attached to the ground (collectively "improvements") may be owned by a person other than the owner.[2] La. Civ. Code. art. 491, 493. In this case, O'Niell's mineral lease provided O'Niell with authority and permission to use the surface land for any purpose incident to the exploration for and production, ownership, possession, and transportation of minerals. Accordingly, the structures built by O'Niell on LL&E's land were originally owned by O'Niell.

Considering that there is no conventional act transferring ownership from O'Niell to LL&E, the United States contends that ownership of these structures transferred to LL&E by operation of article 493 of the Louisiana Civil Code. Article 493 governs the ownership of improvements made on the land of another with the landowner's consent. *Id.* art. 493. On June 27, 2003, the Louisiana legislature amended the second paragraph of article 493. 2003 La. Acts 715, § 1.

Under the post-amendment article 493, when the owner of improvements no longer has the right to keep them on the land, the land owner may provide the owner of the improvements with written notice demanding that the owner of the improvements remove the improvements

---

[2] None of the parties have asserted that the structures at issue are not buildings or other constructions attached to the ground.

from the land. La. Civ. Code art. 493. If the owner of the improvements does not remove the improvements from the land within ninety from written demand, the land owner can appropriate ownership of the improvements by providing an additional written notice by certified mail of his intent to appropriate ownership of the improvements. *Id.* Upon receipt of the certified mail, the land owner obtains ownership of the improvements and owes nothing to the former owner. *Id.*

Under the pre-amendment article 493, the owner of the land acquired ownership of the improvements if the owner of the improvements failed to remove the improvements within ninety days after the written notice demanding removal of the improvements. La. Civ. Code art. 493 (amended 2003). Therefore, under post-amendment article 493, two written demands are required before ownership transfers; whereas, under pre-amendment article 493, only one written demand is required. Furthermore, in amending article 493, the Louisiana legislature expressed its intent to make this amendment retroactive. La. H.R. Con. Res. 306 (2004); La. H.R. Con. Res. 134 (2004).

In situations involving a lease, under post-amendment article 493, there are four necessary steps before ownership transfers: (1) termination of the lease; (2) written demand; (3) the passage of ninety days from the written demand; and (4) a second written demand by certified mail and receipt thereof. Under pre-amendment article 493, there are only three necessary steps before ownership transfers: (1) termination of the lease; (2) written demand; and (3) the passage of ninety days from the written demand.

First, according to the United States, O'Niell's mineral lease terminated by May 20, 1999, at the latest. In support of this position, the United States introduces three exhibits. The first exhibit is Compliance Order No. E-I&E-99-234 dated April 12, 1999, from the DNR to O'Niell.

The compliance order informed O'Niell that certain wells under his control have remained inactive for an extended period and, as such, are classified as having no future utility. In addition, the compliance order commands O'Niell to plug and abandon all these wells and to remove all equipment, structures, and trash associated with the wells.

The second exhibit is a letter dated April 21, 1999, from the DNR to O'Niell. In this letter, the DNR advised O'Niell that certain oilfield sites referenced in Compliance Order No.E-I&E-99-234 and five other compliance orders were not closed and, as such, are declared orphaned. Furthermore, the letter indicated that notice of this abandonment would be published in the State Register.

The third exhibit is the May 20, 1999 publication in the State Register providing notice that the wells indicated in the April 21, 1999 letter are declared orphaned. Eighty-five of the wells referenced in the publication were wells operated by O'Niell.

Second, the United States asserts that the October 8, 1999 letter from LL&E to O'Niell was a demand letter. The United States' position is based on the following language:

> Recently, representatives of [LL&E] conducted a survey of the surface covered by the subject leases and were able to identify numerous sites whereon was located abandoned equipment and trash which included wellheads, tanks, pipe, board road, houses and other debris that needs to be cleared and removed from the property. Obviously, [LL&E] is concerned about the liability, both personal and environmental, that these sites pose and it is therefore requested you take immediate action to clear these sites as soon as possible and restore the leased premises to their original condition as is reasonably possible.

Third, the United States argues that ninety days proceeded without any action taken by O'Niell. The United States asserts that the passage of ninety days without removal by O'Niell was sufficient to transfer ownership of the structures from O'Niell to LL&E, notwithstanding the

7

fact that LL&E did not send a second written demand by certified mail as required by post-amendment article 493. According to the United States, LL&E was not required to send the second written demand because retroactive application of post-amendment article 493, despite the Louisiana legislatures' intent, would violate the Due Process Clause of the United States and Louisiana Constitutions because it would deprive the parties of their vested rights and defenses. Therefore, the United States argues that LL&E had acquired ownership of O'Niell's structures by the time of the remediation project because the lease terminated by May 20, 1999, the written demand was provided on October 8, 1999, and ninety days passed without removal of the structures.

Conversely, LL&E contends that the lease did not terminate by May 20, 1999. In support of its position, LL&E offers one exhibit. The exhibit is a letter dated February 16, 2000, from Mr. O'Connell to Brad Rome, another employee of LL&E, relaying Mr. O'Connell's opinion that a well was still productive. Furthermore, LL&E asserts that it also received royalty payments from O'Niell as of April 2000.

As to the written demand letter dated October 8, 1999, LL&E claims that this letter is not a demand letter for purposes of article 493. Instead, LL&E classifies this letter as a request that O'Niell cleans up its abandoned property to aid in an LL&E clean-up program.

Lastly, according to LL&E, post-amendment article 493 applies to this case because the Louisiana legislature intended to make the amendment retroactive, and retroactive application would not violate either the United States or Louisiana Constitutions. Accordingly, since LL&E never provided O'Niell with a second written demand by certified mail as required by post-amendment article 493, LL&E never appropriated ownership of the structures from O'Niell.

8

In addition to its lack of ownership argument, LL&E also contends that it is not a responsible party because O'Niell abandoned its structures. Pursuant to section 2702(1)(32)(F), in cases involving abandoned facilities, the responsible party is the former owner or operator of the facility. LL&E asserts that the structures at issue are abandoned property and, since O'Niell was the former owner and operator of the structures, O'Niell, not LL&E, is the responsible party.

The Court will first address the abandoned property issue raised by LL&E. Since OPA-90 does not define "abandoned," this Court will once again turn to Louisiana law to determine the meaning of the term. Under Louisiana law, a thing is abandoned when its owner relinquishes possession with the intent to give up ownership. La. Civ. Code art. 3418. As such, to determine if O'Niell had abandoned its structures, this Court must find that (1) O'Niell relinquished physical possession of the structures; and (2) O'Niell intended to give up ownership. *Bickham v. Bussa Oil & Gas Co.*, 152 So. 393, 394-95 (La. App. 2 Cir. 1934).

The only evidence presented as to O'Niell's relinquishment of physical possession are the three exhibits, which were produced by the United States and discussed earlier, and the poor condition of the structures at the time of remediation. This evidence is insufficient to show that O'Niell relinquished physical possession of the structures. The three exhibits only concern certain oil wells and whether they were considered abandoned by the DNR. This has little to no bearing on whether O'Niell relinquished possession of the structures at issue. Furthermore, even if the structures were in disrepair, a thing in disrepair is not a thing abandoned.

In addition, neither party presented any evidence as to whether O'Niell intended to give up ownership of the structures. Accordingly, the Court cannot find that O'Niell abandoned the structures at issue as a matter of law. This Court must now turn to the ownership of the

structures by operation of article 493.

As to the termination of the mineral lease, the Court finds that there is insufficient evidence to determine if and when the lease was terminated. All that the United States' exhibits show is that <u>certain</u> oil wells were orphaned at certain times. These exhibits do not support the contention that <u>all</u> oil production and exploration had ceased on the leased property. O'Niell could have had other operational oil wells that were not subject to the letter, Compliance Order, or published notification. Moreover, even assuming that all its oil production had ceased by April 12th, April 21st, or May 20th, O'Niell could have still begun drilling a completely new oil well or performing other operations before the expiration of ninety days and, thus, prevented the termination of the lease.

Additionally, Mr. O'Connell's February 16th letter is insufficient to warrant summary judgment. In the letter and attachment, Mr. O'Connell never specifies which oil well is still productive and whether or not that oil well is operated by or located on O'Niell's lease. Furthermore, as to LL&E's assertion that it received royalty payments from O'Niell as late as April 2000, there is no evidence to support this proposition. Moreover, by April 2000, O'Niell's lease could have already terminated. Therefore, in viewing the facts in the light most favorable to the nonmovant and drawing all reasonable inferences in the nonmovant's favor, the Court finds that neither the United States nor LL&E have satisfied their respective burdens as to when or if the O'Niell's mineral lease terminated.

Despite the Court's inability to find that the lease terminated, the Court has sufficient grounds to find that LL&E never became the owner of the structures at issue. Regardless of whether post-amendment article 493 or pre-amendment article 493 is the applicable law, LL&E

10

was still required to have provided O'Niell with written notice demanding that O'Niell remove the structures from LL&E's land. This notice was never provided.

The United States urges this Court to find that the October 8, 1999 letter from LL&E, acting through its agent Mr. O'Connell, to O'Niell was an article 493 demand letter. Simply put, this letter was not. Although LL&E does request O'Niell to remove abandoned equipment, LL&E also recognizes that O'Niell's lease is still in effect by stating that the leases are "owned" by O'Niell. If this was a article 493 demand letter, LL&E would not have referred to the leases as "owned" by O'Niell because the leases would have been terminated. Instead, the letters would have appropriately notified O'Niell that its lease had terminated and that LL&E was demanding— not requesting—O'Niell to remove its structures. Additionally, in the letter, LL&E states that the letter is in connection with LL&E's Fee Land Clean-Up program, which was initiated in the late 1980s. The letter also stipulates that LL&E has contacted many other companies and individuals in this regard and that these companies and persons have been cooperative. If this were an article 493 letter, LL&E would not have stated that its letter was in connection with a clean-up program and would not have previously contacted other mineral lessees in a similar manner. These facts would have been irrelevant and unnecessary in an article 493 letter. Lastly, in the concluding paragraph, LL&E asks O'Niell to respond to the letter within ten days assuring O'Niell's cooperation. With an article 493 letter, there is no need or reason for a lessee to respond. The lessor does not have to take any legal action. Ownership transfers by operation of law, provided the appropriate steps are taken. As such, if this letter was an article 493 demand letter, the request for a response was another unnecessary step.

Thus, the letter taken as a whole cannot be construed as an article 493 demand letter.

11

Despite the fact that this Court has not found any Louisiana cases specifically addressing what must be contained in an article 493 demand letter, this Court finds that more is required than a request to remove abandoned equipment, trash, and debris in connection with a clean-up program from a mineral lease still owned by the lessee, especially when other companies and individuals have been asked to do the same. Although this Court will not say what must be contained in an article 493 letter or how specific the letter must be, more is required than what LL&E provided. Therefore, since LL&E never sent O'Niell a written demand letter as contemplated by article 493, LL&E did not acquire ownership of O'Niell's structures.

Considering that this Court finds that LL&E never sent O'Niell a demand letter, it is unnecessary to determine if post-amendment article 493 or pre-amendment article 493 applies to this case. Furthermore, considering that this Court finds that LL&E never acquired ownership of the structures, LL&E cannot be a responsible party under section 2702. Considering that LL&E is not a responsible party, it is unnecessary to determine if any of the other elements of liability under section 2702 have been met.

## IV. CONCLUSION

For the foregoing reasons, LL&E's motion for summary judgment is GRANTED and the United States' cross-motion for summary judgment is DENIED.

New Orleans, Louisiana, this 16 day of March, 2006.

UNITED STATES DISTRICT JUDGE